**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **BRYAN BLOUNT, AIS #225319,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. CV18-970-WHA** |
| | ) | |
| **COMMISSIONER CULLIVER,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' SPECIAL REPORT

COME NOW the Defendants Grant Culliver, Angie Baggett, Vivian McQueen, Joseph Headley, Mary Cooks, and Charles McKee, Defendants in the above-styled case, and hereby respectfully file their Special Report.

## INTRODUCTION

The Court has ordered the Defendants to respond to the Plaintiff's Amended Complaint (Doc 6.) that was filed on January 25, 2019.  (Doc 8.)  The Court's most recent Order granting the Defendants' request for an extension required them to file an Answer and Special Report no later than August 26, 2019.  (Doc 26.)  The Defendants file this Special Report in accordance with the Court's instructions to respond to the allegations in the Amended Complaint, but subject to the objection set forth below.

## PLAINTIFF'S ALLEGATIONS[1]

In his Amended Complaint Plaintiff makes two claims against the Defendants: 1) violation of his Eighth Amendment rights to be free from cruel and unusual punishment; and 2) a violation of his Fourteenth Amendment due process rights.  (Doc 6 at pp. 2-3.)  All claims are

---

[1] In accordance with the Court's instructions, the Defendants recite and address only those claims contained in the Amended Complaint.  (Doc 36.)

brought against the Defendants in their official and individual capacities.  (<u>Id.</u> at p. 2.)  The factual nexus connecting the Plaintiff's claims is an incident between the Plaintiff and another inmate, Billy Smith.  The Plaintiff avers that the ADOC falsely accused him of assaulting inmate Smith, imposed administrative disciplinary sanctions against him for the assault at a procedurally deficient hearing in which no evidence was presented, and then reclassified him to close custody based upon the improper disciplinary sanctions.  (<u>Id.</u> at pp. 2-3, 5-6.)

**DEFENDANTS' RESPONSE TO PLAINTIFF'S ALLEGATIONS**

The Defendants concede that the Plaintiff was charged and found guilty of assaulting inmate Smith in a disciplinary proceeding.  The Defendants also admit that the Plaintiff's custody level was subsequently reevaluated and he was placed in close custody.  However, the Defendants deny Plaintiff's remaining allegations as being untrue and completely without basis in either fact or law.  Additionally, because the Plaintiff has already brought nearly identical claims in state court – and lost – he is precluded from relitigating his claims before this Court.  Furthermore, Defendants assert that they are entitled to qualified immunity and ask that this Special Report be treated as a Motion for Summary Judgment, and that judgment be entered in their favor as a matter of law.

I.   **EVIDENCE PRESENTED AND PROCEDURAL ARGUMENTS BASED UPON EVIDENCE PRODUCTION.**

A.   **Documentary Evidence Presented.**

1.   Affidavit of Supervisory Agent William D. Favor ("Favor aff.").

2.   Affidavit of Grantt Culliver ("Culliver aff.").

3.   Affidavit of Charles McKee ("McKee aff.").

4.   Affidavit of Joseph H. Headley ("Headley aff.")

5.   Affidavit of Mary Cooks ("Cooks aff.")

6.  Affidavit of Vivian Ollison ("Ollison aff.").[2]

7.  Affidavit of Angie Baggett ("Baggett aff.").

8.  Complaint, <u>Blount, Bryan v. ADOC, et al.</u>, Montgomery County Circuit Court Case Number CV-2018-344 ("Petition").

9.  Memorandum, <u>Bryan Blount v. Alabama Department of Corrections</u>, Alabama Court of Criminal Appeals, CR-18-151 ("Memorandum").

10. Order Denying Rehearing, <u>Bryan Blount v. Alabama Department of Corrections</u>, Alabama Court of Criminal Appeals, CR-18-151 ("Order").

11. Administrative Regulation 403, *Inmate Discipline* ("AR 403").

12. Plaintiff's Inmate Movement History ("Mvmt his.").

13. Plaintiff's Classification Summary ("Class. sum.").

14. Disciplinary Report, ELMCF-17-03033-1 ("Disc. rep.").

15. Front camera video of Elmore Correctional Facility, dormitory A-2 on November 13, 2017 ("Front video").

16. Rear camera video of Elmore Correctional Facility, dormitory A-2 on November 13, 2017 ("Rear video").[3]

**B.    Objection to filing Special Report and <u>Heck v. Humphrey</u>.**

**1.    Objection.**

In previous motions seeking permission to file a motion to dismiss, a stay, or extension of time, the Court was previously informed that a manslaughter case was being presented to the Elmore County grand jury against the Plaintiff for the death of inmate Smith.  (Docs 26, 28, 35.) The Court has denied all of the requests except for extensions of time.[4]  (Docs 27, 29, 36.)  The Defendants renew their objection to being required to file a Special Report now that the Elmore County grand jury has indicted the Plaintiff for manslaughter in the death of Billy Smith.  (Favor

---

[2] Vivian Ollison is Defendant Vivian McQueen.
[3] Both video exhibits will be provided to the Court conventionally after the filing of the Special Report.
[4] In the last such Order, the Court informed the Defendants that no further extensions would be granted.  (Doc 36.)

aff. at ¶8, Blount Indictment attachment.)  In ordering the Defendants to move forward, even post-indictment, the Court has restricted their ability to defend themselves.  (Doc 27 (denying Defendants' Motion for Permission to File Motion to Dismiss/Alternative Motion to Stay); 2d Favor aff. at ¶ 4.)  Evidence (some of which could be used to compromise a confidential informant) cannot be produced because it is part of an open and active criminal investigation that is protected under both federal and state law.  (Id. at ¶¶ 7-8; see, also, United States v. Rutherford, 175 F.3d 899, 901 (11th Cir. 1999) ("[t]he government has the privilege to withhold from disclosure the identity of its informants."); Hickey v. Columbus Consol. Gov't, 2008 WL 450561, *45 (M.D. Ga. 2008) (recognizing federal law enforcement investigatory privilege); Ala. Code Section 12-21-3.1(d) (stating that the release of investigative files "prior to the disposition of the criminal matter under investigation" is disfavored and authorizing subpoenas only upon a showing of substantial need and an inability to obtain the information elsewhere without undue hardship.)

The Court has given the Defendants a Hobson's Choice of either moving forward without evidence in the investigative files or produce the evidence and risk compromising the identity of a CI and/or an ongoing and *homicide* investigation and prosecution.  The Defendants submit this Special Report subject to this objection without all of the evidence in an effort to try to comply with this Court's orders and avoid compromising the state criminal case.  Defendants acknowledge, and are grateful for, the Court allowing them to file a supplemental report should the need and ability arise.  (Doc 36.)

### 2.      Heck v. Humphrey.

By moving forward now, there is significant risk of creating the inconsistent outcomes forbidden by the United States Supreme Court in Heck v. Humphrey, 512 U.S. 477, 486-487

(1994).   Specifically, the Supreme Court held "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254."   Id. Allowing this case to go forward simultaneously with the state court criminal case necessarily runs the risk of this court issuing a ruling that directly conflicts with the ultimate resolution of Plaintiff's manslaughter charge.   An inconsistency could be created, for example, with a judgment entered for the Plaintiff in the instant case on his theory that ADOC officials are scapegoating him for Billy Smith's death, and a jury verdict of guilty in the state court manslaughter case.

If the Court cannot dispose of this matter in favor of the Defendants in its ruling on the instant Special Report, the Court should stay this case pending the resolution of Plaintiff's state court criminal trial.

## II.      FACTS

### A.      Summary of the Operative Facts.

Plaintiff was convicted of murder and sentenced to 55 years imprisonment in the custody of the Alabama in 2002.   On Monday, November 13, 2017, while in dormitory A-2 of the Elmore Correctional Facility, the Plaintiff punched inmate Billy Smith several times including in the head area.   As a result of one blow, inmate Smith fell and struck his head on the concrete floor.   Inmate Smith was taken to the shift office where witnesses allege that officers mistreated Smith by slapping him, punching him, and delaying in obtaining medical care.   Inmate Smith

was ultimately transported to the Jackson Hospital ER where he was treated for a fractured skull and a large hematoma to the left temporal area of his head. Inmate Smith succumbed to his injuries at Jackson Hospital on December 9, 2017. The medical examiner concluded that the injuries caused by the Plaintiff were the cause of inmate Smith's death.

In accordance with AR 403, *Inmate Discipline*, the Plaintiff was charged by Correctional Lieutenant W.M. Burks, III, with "assault on an inmate." He was served twice with a copy of the charge, given an opportunity to identify witnesses, and informed when and where a hearing would be held. At the hearing, the Plaintiff's witnesses declined to appear, but they did provide written statements. Confidential informants ("CI") provided evidence (with the appropriate reliability determination by hearing officer, Correctional Captain Charles McKee) that the Plaintiff assaulted inmate Smith. The Plaintiff was also permitted to testify and ask questions regarding the reliability of the CIs. Captain McKee found the Plaintiff guilty and recommended the following sanctions: 45-days loss of canteen, phone, and visiting privileges; 45 days of disciplinary segregation; and a custody review. The sanctions were approved by Warden Mary Cooks.

In accordance with the recommendation and ADOC policy, the Plaintiff received a custody review. He received written notice on December 27, 2017. He was informed in the notice that the action was due to the assault on inmate Smith. Plaintiff waived the 24-hour notice requirement. His custody was subsequently changed to close on December 28, 2017. On September 18, 2018, the Plaintiff erroneously had his custody reduced to medium because he had served six months in close custody. The reduction was erroneous because Angie Baggett, the ADOC Assistant Director of Classifications, did not note that inmate Smith had died. Following the discovery of the error and another hearing, the Plaintiff was returned to close custody on

October 2, 2018.  Under the ADOC Classification Manual, assaultive behavior resulting in death requires a minimum of thirty (30) months in close custody.

The death of inmate Smith was investigated by Supervisory Agent William Favor with the ADOC I&I Division.  After an investigation that involved reviewing video, conducting interviewing, and reviewing various documents including the autopsy report, Agent Favor presented a manslaughter charge against Plaintiff to the Elmore County grand jury.  The grand jury returned manslaughter indictments on both the Plaintiff and a correctional officer.

Plaintiff filed a Petition for Writ of Certiorari in the Montgomery County Circuit Court challenging the disciplinary action against him.  As amended, the Petition asserted that his due process rights were violated in three ways: 1) there was no evidence presented at the hearing; 2) he was denied witnesses at the hearing; and 3) the hearing officer was not impartial.  The Petition was dismissed on the ADOC's motion.  Plaintiff's appeal was denied, and a subsequent request for a rehearing was also denied by the Alabama Court of Criminal Appeals on August 23, 2019.  As of the filing of this Special Report, the Plaintiff has not further appealed the Court of Criminal Appeals' decision.

**B.      Detailed Statement of Facts.**

**1.      The incident.**

At all times relevant, the Plaintiff was in the custody of the Alabama Department of Corrections (hereinafter "ADOC"), serving a 55 year sentence for murder.  (Class. sum. at p. 2.)  Between November 13, 2017, and November 30, 2017, the Plaintiff was housed at the Elmore Correctional Facility.  (Mvmt. his. at p. 2.)

On Monday, November 13, 2017, inmate Billy Smith was also at Elmore Correctional Facility.  (Favor aff. at ¶ 9; Disc. rep. at p. 1.)  A subsequent investigation by the ADOC's

Investigations and Intelligence Division ("I&I), revealed that inmate Smith and the Plaintiff were engaged in a conspiracy to smuggle drugs into Elmore Correctional Facility.  (Favor aff at ¶ 10.) A confrontation between the Plaintiff, Inmate Smith, and another inmate resulted from inmate Smith "shorting" a package of synthetic marijuana.  (Id.)

Blurry video from inside of dormitory A-2, shows a confrontation between two black males and a white male.    At approximately 5:46:21 pm, one of the black males punches the white male.  The white male falls back from the blow and retreats into the aisle between the rows of beds.  At approximately 5:46:35, the white male punches the black male who initially punched him, turns, and runs for the front of the dorm.  The black male pursues.  from While both men were in dormitory A-2, the Plaintiff punched inmate Smith in the head area.  (Front video beginning at 17:46; Rear Video beginning at 17:46; Favor aff. at ¶¶ 11-12.)  As a result of a blow delivered by the Plaintiff, inmate Smith fell and struck his head on the concrete floor.  (Favor aff. at ¶ 11.)

Inmate Smith was taken to the shift office.  (Favor aff. at ¶ 13.)  While at the shift office, witnesses alleged that correctional officers slapped and punched inmate Smith.  (Id. at ¶ 13.) There was also a delay in getting him medical treatment.  (Id.)  Inmate Smith was eventually escorted to the Staton health care unit and later transported the Jackson Hospital E.R. where he was treated for fractured skull and a large hematoma to the left temporal area of his head.  (Id. at ¶ 14.)  Inmate Smith died at Jackson Hospital on December 9, 2017, at 4:30 a.m. (Id. at ¶ 15.)

Dr. Steven Boudreau conducted an autopsy on Billy Smith.  (Favor aff. at ¶ 16.)  The autopsy results were that Smith died of a fractured skull that eventually caused a mid-line shift of his brain.  (Id.)  Given all of the facts concerning what happened to Billy Smith on November 13,

2017, Dr. Boudreau concluded that it was the Plaintiff's attack that caused the death of Billy Smith.  (Id. at ¶ 17.)

### 2.     Plaintiff's disciplinary proceeding.

Prior to the incident between the Plaintiff and inmate Smith, the ADOC promulgated an Administrative Regulation ("AR") governing the conduct of inmates and setting forth disciplinary procedures for enforcing its rules.  (See generally AR 403.)  AR 403 contains a rule Violations Table broken down into three levels: high, medium, and low.  (Id. at Change 2.)  Rule 906 makes it a high level violation for an inmate to assault another inmate.  (Id. at Change 2, pp. 2, 4.)  The Rule Violations Authorized Sanctions Table contains progressive authorized sanctions that may be imposed for rule violations based upon the level of the violation.  (AR 403 at Annex B.)

AR 403 also sets forth the due process requirements for inmate disciplinary hearings. (AR 403 at pp. 3-14.)  In general, an ADOC employee may arrest an inmate for a rules violation and, within ten working days[5], serve Form 403-A on the inmate.  Form 403-A provides notice to the inmate by providing *inter alia* the following information: 1) the violation; 2) the date, time, and place of the violation; 3) the facts underlying the violation; 4) that a hearing will take place within 24 hours; and the inmate's ability to be present at the hearing, present statements, present written questions to witnesses, and call witnesses of his own.  (AR 403 at pp. 4-5; Disc. rep. at p. 1.)  AR 403 also provides for the appointment of a hearing officer who conducts a due process hearing.  (AR 403 at pp. 3-11.)   The regulation contains significant due process protections before, during, and after the hearing including:

---

[5] Form 403-A service is required within ten days of the incident being discovered, the completion of an I&I investigation, or the return of an escaped inmate.  (AR 403 at p. 3.)

-    A minimum of 24 hours, and a maximum of 10 working days to prepare for the hearing;[6]

-    Confirmation by the hearing officer that the notice provisions have been followed;

-    Presence of the accused inmate at the hearing;

-    A hearing at which the inmate is permitted to hear, under oath, the charges against him, have his written questions answers, speak for himself, and present the testimony of witnesses;

-    If CIs are used, a determination by the hearing officer as to the reliability of the CIs before considering any testimony they may provide;

-    Written notice of the findings are provided to the inmate that include findings of facts by the hearing officer; and

-    Review of the hearing officer's findings by the facility warden who may approve or disapprove of the sanctions recommended by a hearing officer, but who cannot disturb the hearing officer's findings regarding guilty.

(AR 403 at pp. 3-14.)

The Plaintiff was charged by Lt. W.M. Burks, III, with a violation of Rule 906, assault on an inmate, for striking inmate Smith.  (Disc. rep. at p. 1.)  He was served by Teresa Norman on November 30, 2017, at Elmore Correctional Facility, and elected to not call any witnesses.  (Id.)  However, the Plaintiff was transferred to Draper Correctional Facility on the same day.  (Mvmt. his. at p. 2.)  As a result, the Plaintiff was served a second time on December 8, 2017, at Draper, by Ulysses Oliver.  (Disc. rep. at pp. 2-3.)  This time, the Plaintiff requested three witnesses: 1) inmate Paul Smith; 2) inmate Justin Mayes; and 3) Officer J. McClease.  (Id.)  In both notices the Plaintiff was informed of the nature of the charges against him and the following recitation of the supporting facts:

On November 30, 2017, at approximately 9:00 a.m., Correctional Lieutenant W. M. Burks III received information that inmate Bryan A. Blount BM/225319,

---

[6] An exception exists to allow hearings outside of the ten-day period with the service of a Notice of Postponement and/or the re-initiation of the proceedings.  (AR 403 at pp. 6, 14-15.)

assaulted inmate Billy M. Smith WM/250398, on November 13, 2017. The information was received from several confidential sources. The confidential sources have been used several times before. The information provided in the past has been truthful. Other information has been received to corroborate the confidential sources' given information. The information uncovered during the investigation has not given the confidential sources a reason to lie. The information from the confidential sources is reliable.

(Disc. rep. at pp. 1-2.)

Plaintiff's disciplinary hearing was held six days later in the Draper segregation unit. (Disc. rep. at pp. 3-4.) The appointed hearing officer was Defendant Correctional Captain Charles McKee. (Id.) The Plaintiff was present and entered a plea of "not guilty." (Id.) The arresting officer and witnesses were sworn to tell the truth. (Id.) The arresting officer repeated his testimony regarding the confidential information and was questioned by the hearing officer (QBHO denotes "Question By Hearing Officer") as well as the Plaintiff regarding the CIs' reliability. (Id. at pp. 5, 7.) Plaintiff testified at denied assaulting inmate Smith. (Id. at p. 5.) All three of the Plaintiff's witnesses refused to appear, but each submitted a written statement to the hearing officer. (Id. at pp. 5, 8-10.) Plaintiff also was permitted to submit written questions and receive written answers from each witness. (Id. at pp. 11-12.) Plaintiff's inmate witnesses all denied having any knowledge about the incident. (Id.)

Captain McKee found that the Plaintiff did assault inmate Smith and found the Plaintiff guilty. (Disc. rep. at p. 5.) The written basis for Captain McKee's findings included the Lt. Burks's testimony regarding the information provided by the CIs and their reliability, the failure of the Plaintiff's witness statements to support his plea, and the failure of the Plaintiff's cross examination of Lt. Burks to support his plea. (Id.) Captain McKee recommended 45 days loss of canteen, telephone, and visitation privileges, 45 days in disciplinary segregation, and a review of the Plaintiff's custody level. (Id. at pp. 5-6.) Warden Mary Cooks approved Captain

McKee's recommendations.  (Id. at pp. 13-15.)  The Plaintiff refused to sign for his copy of the final determination.  (Id. at p. 15.)

Captain McKee affirmatively states that he followed AR 403 and did not violate the Plaintiff's rights.  (McKee aff. at p. 1.)  Warden Cooks testifies in her affidavit that she approved Captain McKee's recommendations based upon the information provided in the disciplinary. (Cooks aff. at p. 1-2.)  As demonstrated by the disciplinary documents, Warden Headley had no role in the disciplinary.  He does note in his affidavit that an internal review resulted in the initiation of the disciplinary.[7]  (Headley aff. at p. 1.)  He further supports Captain McKee's conduct of the proceedings by stating that all elements of the report were completed in accordance with AR 403.  (Id.)

Retired Associate Commissioner Culliver testifies in his affidavit that the only direct knowledge he had about the incident was that Billy Blount had died and I&I was investigating. (Culliver aff. at ¶ 4.)  As the Associate Commissioner of Operations, Mr. Culliver had no authority over the I&I Division who conducted the criminal investigation or Classifications which made the close custody determination complained of by the Plaintiff.  (Id. at ¶¶ 5, 9.)  Mr. Culliver did not know that the Plaintiff had received a disciplinary for assaulting inmate Smith until he read the Complaint in this case.  (Id. at ¶ 8.)  He played no role in the disciplinary and had no conversations with anyone regarding the disciplinary proceeding.  (Id.)

### 3.   The Criminal Investigation.

While, and long after the above-referenced disciplinary proceeding concluded, Supervisory Agent William Favor conducted an investigation into inmate Smith's death.  (Favor aff. at ¶¶ 3-4.)  It was Agent Favor's investigation that resulted in the discovery of the sequence

---

[7] It should be noted that it was Lt. Burks and not Warden Headley who is the arresting officer and initiated the disciplinary against the Plaintiff.  (Disc. rep. at p. 1.)

of events set forth in Section B.1. above.  (See generally Favor aff.)  Like Captain McKee, Agent Favor also concluded that the Plaintiff assaulted inmate Smith.  (Compare, Disc. rep. at p. 5, with Favor aff. at ¶¶ 8-17.)  Agent Favor's conclusion was the result of an investigation that involved a review of video of the incident; interviewing inmate, correctional officer, and medical witnesses; and documents including Billy Smith's autopsy.  (Favor aff. at ¶ 7.)  The Elmore County grand jury also agreed finding that there was probable cause to issue a manslaughter indictment against the Plaintiff on July 12, 2019.  (Id. at ¶ 8, Blount Indictment attachment.)  The grand jury also chose to indict Correctional Officer Jeremy Singleton for manslaughter as well. (Id. at Singleton Indictment attachment.)

### 4.    Plaintiff's Custody Determinations.

As a result of the disciplinary recommendation, a review of the Plaintiff's custody level was conducted.  (Ollison aff. at p. 1; Baggett aff. at p. 1.)  Ms. Ollison is a Classification Review Analyst with the ADOC with nearly 30 years of experience in ADOC classifications.  (Ollison aff. at p. 1.)  Ms. Baggett is the Assistant Classifications Director with 26 years of experience in ADOC classifications.  (Baggett aff. at p. 1.)

In accordance with the ADOC Classification Manual, the Plaintiff was served with a 24 Hour Advance Notification of Pending Reclassification on December 27, 2019.  (Ollison aff. at p. 1., Attachments p. 6.)  The Notification informed the Plaintiff that the reason for his action was the negative behavior that resulted in the disciplinary action for the assault on inmate Smith. (Id.)  It further informed him that at the meeting he would be given "an opportunity to be heard, to present witnesses and to present documentary evidence."  (Id. at Attachments p. 6.)  Plaintiff waived his right to 24-hour advance notification.  (Id.)

The Due Process Minutes of the reclassification hearing states that B. Bates presented evidence regarding the assault on inmate Smith and the subsequent disciplinary proceeding that found the Plaintiff guilty of assault on an inmate.  (Ollison aff. at Attachments, p. 7.)  The Plaintiff did not present a written statement in rebuttal, but did state orally that he did not assault Smith.  (Id.)  Both parties were permitted to ask questions, but neither side availed themselves of the opportunity.  (Id.)  The hearing officer, Lt. Nolen, determined that the Plaintiff should be placed on close custody.  (Id.)

On September 18, 2018, Kilby Correctional Facility submitted a Close Custody Reduction Review Form asking that the Plaintiff's custody be reduced.  (Baggett aff. at p. 2, Attachment p. 9.)  The request noted that the Plaintiff had been in restricted housing since November 30, 2017, and close custody since December 28, 2017.  (Id.)  The Plaintiff received another three disciplinaries during his time in close custody including possession of a cell phone, possession of contraband, and arson.  (Id.)  Nonetheless, because it was believed at the time that the Plaintiff had served the minimum amount of time in restrictive housing (6 months) that he should be reclassified to medium custody.  (Id.)

Assistant Director Baggett candidly admits in her affidavit that in reviewing the Plaintiff for a custody reduction that she did not notice that inmate Smith had died as a result of the assault.  (Baggett aff. at p. 2.)  Due to this oversight, she approved the reduction of the Plaintiff's custody level to medium on September 18, 2018.  (Id.)  Inmate Smith's death was important to the decision because under the Classification Manual, an inmate whose assaultive behavior that results in death must serve a minimum of 30 months in close custody.  (Id. at p. 2, Attachment p. 10.)

The error was caught by classification personnel when the Plaintiff was transferred to St. Clair Correctional facility on September 24, 2018.  (<u>Id.</u> at p. 2.)  When it was brought to her attention, Assistant Director Baggett directed the institution of due process proceedings similar to those discussed previously.  (<u>Id.</u>)  The Plaintiff was again served notice, again waived notice, again was given a hearing, and again the recommendation was that he return to close custody. (<u>Id.</u> at p. 2, Attachment pp. 11-13.)

### 5.    Plaintiff's Petition for Writ of Certiorari.

Plaintiff admits that he brought a lawsuit in state court "dealing with the same or similar facts involved in this action."  (Doc 6 at p. 1.)  Specifically, he alleges that he filed a petition for a writ of certiorari in the Montgomery County, Alabama Circuit Court, case number CV-18-344. (<u>Id.</u> at pp. 1-2.)  The case was dismissed by the trial court, and at the time of the filing of Plaintiff's amended complaint the state court action was on appeal to the Alabama Court of Criminal Appeals.  (<u>Id.</u> at p. 2.)

The Memorandum in <u>Bryan Blount v. Alabama Department of Corrections</u>, Alabama Court of Criminal Appeals Case Number CR-18-0151 confirms the Plaintiff's representations to the Court.  (Memorandum at pp. 1-2.)  The Alabama Court of Criminal Appeals noted that in the initial Petition filed on June 16, 2018, the Plaintiff attacked the validity of the same disciplinary at issue in this case on three grounds: 1) there was no evidence presented at the hearing; 2) he was denied witnesses at the hearing; and 3) the hearing officer was not impartial.  (<u>Id.</u> at p. 2.) He then amended his Petition to assert that "the hearing officer used arbitrary and capricious measures to find [him] guilty of assault on an inmate at a disciplinary hearing where the victim of the alleged incident was dead.  Therefore, [he] was arbitrarily and capriciously found guilty of

murder." (Id. at p. 3.)  The ADOC filed a motion to dismiss that was granted by the trial court. (Id.)

In affirming the trial court, the Alabama Court of Criminal Appeals noted that none of the sanctions imposed on the Plaintiff were recognized liberty interests.  (Memorandum at pp. 5-6.) Accordingly, the Plaintiff was not entitled to due process because he did not suffer the loss of any recognized liberty interest.  (Id. at p. 6.)  On August 23, 2019, the Alabama Court of Criminal Appeals denied the Plaintiff's request for a rehearing.  (Order.)  As of the filing of this Special Report, a check of the record by the undersigned did not reveal any further appellate activity on the part of the Plaintiff.

**III.    LAW**

      **A.    All Claims by Plaintiff Against the Defendants in Their Official Capacities Must Fail Based on Eleventh Amendment Immunity and Because They are not "Persons" Under 42 U.S.C. § 1983.**

It is unclear whether the Plaintiff is suing these Defendants in their official capacities, individual capacities, or both.  To the extent they exist, the Plaintiff's claims against the Defendants in their official capacities are due to be dismissed for lack of subject matter jurisdiction as such claims are barred by the Eleventh Amendment to the United States Constitution.  Williams v. Bennett, 689 F.2d 1370, 1378-79 (11th Cir. 1982).

In addition, the official capacities claims must fail because 42 U.S.C. § 1983 prohibits a *person*, acting under color of law, from depriving another of his rights secured by the United States Constitution.  42 U.S.C. § 1983 (emphasis added).  The United States Supreme Court has held that state officials, in their official capacities, are not "persons" under § 1983.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).  Any official capacity claims against the Defendants should therefore be dismissed because the Defendants are not "persons" under §

1983, and therefore all official capacity claims fail to state a claim upon which relief can be granted.  Id.; Carr v. City of Florence, 918 F.2d 1521, 1525 n.3 (11th Cir. 1990).

    **B.**    **Plaintiff's Claims are Barred by *Res Judicata*.**

    The doctrine of *res judicata* bars relitigation of claims that were litigated, ***or could have been litigated*** in an earlier suit.  Manning v. City of Auburn, 953 F. 2d 1355, 1358 (11th Cir. 1992).  In determining whether a judgment from Alabama will have preclusive effect in an action pending in federal court, the federal court must apply the *res judicata* rules of Alabama.  Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 520 (1986).  "Under Alabama law, the essential elements of *res judicata* are: '(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits.'"  National Association for the Advancement of Colored People v. Hunt, 891 F. 2d 1555, 1560 (11th Cir.1990) (citations omitted).  The Memorandum attached to this Special Report demonstrates the first two elements conclusively.  As set forth below, the remaining two elements also apply.

    To determine substantial identity of the parties, courts look for two classes of persons: 1) those who were actual parties in the prior litigation; and 2) persons who are in privity with the parties to the original suit.  Lary v. Ansari, 817 F. 2d 1521, 1523 (11th Cir. 1987).  The instant Plaintiff clearly falls into the first class as he filed both lawsuits.  The Defendants do not fit the first category, but they are equally clearly in the second category.

    Privity consists of a relationship between one who is a party of record and a nonparty that is sufficiently close so a judgment for or against the party should bind or protect the nonparty.  Hunt, 891 F. 2d at 1560.  Privity exists where the non-party's interests were represented adequately by the party in the original suit or where their interests are so closely aligned as to

make the party in the earlier case virtually the non-party's representative.  Id.  In the state court

Petition, the Defendant was the ADOC.  Each of the Defendants in the case at bar are officials of

the ADOC who made (or allegedly made) the decisions complained of in the state court Petition.

Accordingly, privity exists between the instant Defendants and the ADOC to satisfy the

substantial identity element of *res judicata*.  Id. (finding that the interests of a state representative

plaintiff in a prior suit who was a member of the plaintiff organization in the later suit

established privity).

In the test for the last element of *res judicata* is whether the primary right and duty or

wrong are the same in each action.  Hunt, 891 F. 2d at 1561.  This case presents the same cause

of action as the state court Petition – alleged violation of the Plaintiff's due process rights

stemming from the disciplinary he received for assaulting inmate Smith.  (Compare Petition with

Doc 6.)  Some of the factual allegations are the same as well (e.g., that Captain McKee found the

Plaintiff guilty on no evidence).  (Id.)  At best, the Plaintiff has brought forth new theories for his

due process claim.  However, *res judicata* applies not only to the claims presented in the earlier

action, "but to all legal theories and claims arising out of the same nucleus of operative fact."

Hunt, at 1561.  Accordingly, as all of the elements of *res judicata* are met, the Plaintiff's claims

are barred.

### C.      In Their Individual Capacities, the Defendants are Entitled to Summary Judgment Based on Qualified Immunity.

In their individual capacities, the Defendants are entitled to qualified immunity.

Qualified immunity protects "government officials 'from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  This immunity balances the need for official

accountability with the need to permit officials to engage in their discretionary duties without fear of personal liability or harassing litigation. Pearson, 555 U.S. at 231.

In order for government officials to enjoy qualified immunity, they must first establish that they were acting within the scope of their discretionary authority when the alleged wrongful acts occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate. Id. First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right. Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct. Pearson, 555 U.S. at 232; Grider v. City of Auburn, 618 F. 3d 1240, 1254 (11th Cir. 2010). A plaintiff must satisfy both prongs of the analysis to overcome a defense of qualified immunity. Grider, 618 F.3d at 1254. The determination of these elements may be conducted in any order. Pearson, 555 U.S. at 236.

## 1.     The Defendants Acted Within Their Discretionary Authority.

Once a public official has asserted the defense of qualified immunity, he bears the burden of proving that he was acting within his discretionary capacity. Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988). In order to establish that he is acting within his discretionary capacity, a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Id. at 1564 (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir. 1981)). Courts should not be "overly narrow" in interpreting this requirement. Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994). To determine this question "a court must ask whether the act complained of, if done for a proper purpose, would be within, or

reasonably related to, the outer perimeter of an official's discretionary duties."   Harbert Intern., Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (citation omitted).  "[T]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."   Godby v. Montgomery County Bd. of Educ., 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

Each of the instant Defendants was acting within his or her discretionary authority during all times relevant to the Plaintiff's Amended Complaint, as all of their actions were taken in the furtherance of their respective job duties.   See, e.g. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004).   It is only in their capacities as senior corrections officials, correctional officers, and classifications personnel that they had any obligation or authority to act as alleged in the Amended Complaint.   There can be little doubt that conducting disciplinary hearings are within the outer perimeter of a correctional officer's duties, or that making custody decisions are not just within the duties of a classifications specials, but central to the purpose of the job.   Making decisions with respect to the recommendations of hearing officers and investigators is well within the functions of a warden or commissioner.   James, 157 F.3d at 1282.

## 2.    The Plaintiff's federally protected rights were not violated.

The Plaintiff has alleged due process violations against all Defendants.  However, he was not entitled to due process because he lost no liberty interest as a result of the disciplinary action he complains of.  The United States Supreme Court has held:

> Following Wolff, [v. Jones, 418 U.S. 539 (1974)], we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also Board of Pardons v. Allen, 482 U.S. 369 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, e.g., Vitek v. Jones, 445 U.S. 480, 493 (1980)(transfer to mental hospital), and Washington v. Harper, 494 U.S. 210, 221-222 (1990) (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardships of the inmate in relation to the ordinary incidents of prison life.

This Court further held that:

> Admittedly, prisoners do not shed all constitutional rights at the prison gate, Wolff, 418 U.S., at 555, but "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the consideration underlying our penal system.'" Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977), quoting Price v. Johnston, 334 U.S. 266, 285 (1948). Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.

Sandin v. Conner, 515 U.S. 472, 484 (1995).  The Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.  Meachum v. Fano, 427 U.S. 215, 225 (1976) (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose").

The Eleventh Circuit has identified two circumstances in which a prisoner, an individual already deprived of his liberty in the ordinary sense, can be further deprived of his liberty such that due process is required:

> The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court.  See Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); see, e.g., Vitek v. Jones, 445 U.S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital).  The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484, 115 S.Ct. at 2300; see, e.g., Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process); cf. Dudley v. Stewart, 724 F.2d 1493, 1497-98 (11th Cir. 1984) (explaining how the state creates liberty interests).  In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999).  Even when due process is required, the right is satisfied when the inmate: 1) receives advance written notice of the charges against him; 2) is given the opportunity to call witnesses and present documentary evidence; and 3) receives a written statement setting forth the disciplinary board's findings of fact.  O'Bryant v. Finch, 637 F. 3d 1207, 1213 (11th Cir. 2011) (citing Wolff, 418 U.S. at 563-67).   Further, where a prisoner is further deprived of his liberty, thus triggering due process, and that process is not given, "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."  Baker v. Rexroad, 159 F. App'x 61, 63 (11th Cir. 2005) (quoting McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc )).

This Court has previously held that "an inmate in the Alabama prison system has no constitutionally protected interest in the procedure affecting his classification level, the privileges bestowed upon him, or confinement in the least restrictive prison environment because the resulting restraints are not so severe that they exceed the sentence imposed upon him."  Adams v. Green, 2007 WL 1663094, *3 (M. D. Ala. 2007), report and recommendation adopted, 2007 WL 1655587 (M. D. Ala. 2007) (citing Sandin v. Conner, 515 U.S. 472, 485 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.")); see also Dansby v. Babers, 2015 WL 427108, *6 (M.D. Ala. 2015) (Quoting Sandin and holding that an inmate has "no constitutionally protected interest in the procedure affecting his classification level because the resulting restraint, without more, does not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'")).

From the foregoing citation of law from the Supreme Court down to this Court, it is inescapable that the Plaintiff's due process rights were not violated in either the disciplinary proceeding or the *two* classification hearings he had.  First, the Plaintiff has not identified, and none of the deprivations he alleges, rise to the level of a protected liberty interest.  As noted above such an interest generally only arises in Alabama from the deprivation of good time, and the instant Plaintiff lost no such time here.

Furthermore, even if the Plaintiff was entitled to due process, the record reveals he received it.  In each of the three hearings that are in the record, the Plaintiff received notice, an opportunity to be heard and call witnesses, and a written explanation of the hearing officer's findings.  This is all the process to which he was entitled.  O'Bryant, 637 F. 3d at 1213.

Finally, there can be no procedural deprivation because Alabama provides a post-deprivation remedy of which the Plaintiff has already availed himself – a petition for a writ of certiorari filed in the state courts.  The Plaintiff Petition and the underlying disciplinary have been reviewed by both the Montgomery County Circuit Court and the Alabama Court of Criminal Appeals.  Consequently, even if the Plaintiff's prior litigation over this matter was not *res judicata*, the availability of the post-deprivation remedy renders it impossible for the Plaintiff to establish a due process violation.  Baker, 159 F. App'x at 63; McKinney, 20 F.3d at 1557.

### 3.    <u>The Defendants did not Violate Clearly Established Law.</u>

The Plaintiff must show that clearly established law provided these Defendants with fair warning that their conduct was unlawful by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law.  Storck v. City of Coral Springs, 354 F.3d 1307,

1317 (11th Cir. 2003) (citations omitted).  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).  The Eleventh Circuit has identified the second method as an "obvious clarity" case.  Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted).  In order to show that the conduct of the Defendants was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent."  Willingham v. Loughnan, 261 F.3d 1178, 1187-88 (11th Cir. 2001).  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."  Storck, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

For the reasons set forth in the discussion on the lack of a constitutional violation, the Defendants did not violate clearly established law.  The pre-existing law demonstrates that the Plaintiff 1) was not entitled to due process because he did not lose a liberty interest; 2) received the process required even if he had been entitled; and 3) cannot state a due process violation as a matter of law because Alabama provides a post-deprivation remedy that the Plaintiff used.  Bass, 170 F.3d at 1318; O'Bryant, 637 F. 3d at 1213; Baker, 159 F. App'x at 63; McKinney, 20 F.3d at 1557.

### D.    Summary Judgment Standard

On a motion for summary judgment, the court should view the evidence in the light most favorable to the nonmovant.  Greason v. Kemp, 891 F.2d 829, 831 (11th Cir. 1990).  However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material

facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only reasonable inferences with a foundation in the record inure to the nonmovant's benefit. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves, 530 U.S. at 151, quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299.[8] "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'" Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) quoting Massachusetts School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998).

## CONCLUSION

These Defendants deny each and every allegation made by the Plaintiff, Bryan Blount, in the Amended Complaint. These Defendants have not acted in a manner so as to deprive Plaintiff of any right to which he is entitled.

## MOTION FOR SUMMARY JUDGMENT

The Defendants respectfully request that this Honorable Court treat their Special Report as a Motion for Summary Judgment, and grant unto them the same.

---

[8] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Respectfully submitted this the 26th day of August, 2019.

Steve Marshall
Attorney General

Carrie McCollum (ELL037)
General Counsel
Alabama Department of Corrections

/s/ Gary L. Willford, Jr.
Gary L. Willford, Jr. (WIL198)
Assistant Attorney General

**ADDRESS OF COUNSEL:**
**Alabama Department of Corrections**
**Legal Division**
**301 Ripley Street**
**Post Office Box 301501**
**Montgomery, AL  36130-1501**
**334-353-5495**
**334-353-3891 Facsimile**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the CM/ECF system.  Notification of such filing will be sent by placing the same in the U.S.

Mail, first class postage prepaid and properly addressed on this, the 26th day of August, 2019, to

the following:

Bryan Blount
AIS #225319
St Clair Correctional Facility
1000 St Clair Rd
Springville AL 35146

/s/ Gary L. Willford, Jr.
Gary L. Willford, Jr. (WIL198)
Assistant Attorney General